STATE OF NORTH CAROLINA v. KEITH NORMAN SUDDRETH,
DEFENDANT/APPELLANT

No. 9026SC1145

(Filed 21 January 1992)

1. **Constitutional Law § 359 (NCI4th); Evidence and Witnesses § 1782 (NCI4th)— defendant required to model mask before jury—no error**

In a prosecution of defendant for rape, burglary, assault with a deadly weapon inflicting serious injury, first degree sexual offense, and kidnapping, the trial court did not err in allowing an in-court demonstration requiring defendant to model a mask in the presence of the jury, since the demonstration was conducted to aid the jury in determining whether the victim could see the color of defendant's eyes, and the fact that the mask used in court was not the exact mask worn by the perpetrator did not preclude its use.

STATE v. SUDDRETH

[105 N.C. App. 122 (1992)]

**Am Jur 2d, Criminal Law §§ 945, 946.**

**Propriety of requiring criminal defendant to exhibit self, or perform physical act, or participate in demonstration, during trial and in presence of jury. 3 ALR4th 374.**

2. **Evidence and Witnesses § 701 (NCI4th) — defendant required to model mask — limiting instruction — no error**

The trial court did not commit prejudicial error in giving a limiting instruction about an in-court demonstration requiring defendant to model a hood similar to the one worn by the victim's attacker, where the instruction specifically indicated the hood was not the one used by the attacker, was for illustrative purposes only, and should not be given undue emphasis by the jury.

**Am Jur 2d, Criminal Law §§ 945, 946; Trial §§ 1213, 1283.**

3. **Evidence and Witnesses § 1898 (NCI4th) — arrest report and photo of defendant — admissibility for identification purposes**

The trial court did not err in admitting into evidence an arrest report and photo of defendant for identification purposes where the victim testified that she thought defendant was her attacker except that the attacker had blue eyes and defendant's eyes were brown, and the State's purpose in displaying the photo and report was to show that defendant had worn blue contact lenses in the past.

**Am Jur 2d, Evidence §§ 322, 784, 791, 792.5.**

**Admissibility, and prejudicial effect of admission, of "mug shot," "rogues' gallery" photograph, or photograph taken in prison, of defendant in criminal trial. 30 ALR3d 908.**

4. **Evidence and Witnesses § 1475 (NCI4th) — photograph of weapons — admissibility**

In a prosecution for rape, burglary, assault with a deadly weapon, first degree sexual offense and kidnapping where the victim testified that her attacker thrust something which felt like a gun against her head, cut off her clothes with a knife, traced her body with a long thin knife, and beat her with something which felt like a club, the trial court did not err in admitting into evidence a photograph of weapons found during a search of defendant's car and residence, since the photograph was relevant to show the possibility of weapons

STATE v. SUDDRETH

[105 N.C. App. 122 (1992)]

which were used or could have been used in the attack, and the probative value of the photograph outweighed any prejudice which might have existed.

Am Jur 2d, Evidence § 793.

5. **Evidence and Witnesses § 2201 (NCI4th)— not improper identification**

Testimony by a hair analysis expert that a hair found at the crime scene "is quite likely to have originated from [defendant]," coupled with the expert's statistical probability opinion, did not constitute an improper positive identification of defendant where the expert's statement does not rule out the possibility that the hair originated from a source other than defendant; the statistical illustration did not eliminate the possibility of other sources; the expert refuted a suggestion by defense counsel that he was equating the characteristics of head hair to the uniqueness of fingerprints; and the trial court instructed the jury that comparative microscopy of hair is not accepted as reliable for positively identifying individuals and is not conclusive.

Am Jur 2d, Expert and Opinion Evidence §§ 278, 301.

Admissibility and weight, in criminal case, of expert or scientific evidence respecting characteristics and identification of human hair. 23 ALR4th 1199.

6. **Evidence and Witnesses § 2200 (NCI4th)— eyewitness identification—factors affecting reliability—expert witness's testimony properly excluded**

The trial court did not err in excluding the testimony of an expert witness concerning the factors affecting the reliability of eyewitness identification where the court found that the evidence was not case specific, did not have sufficient probative value, would confuse the jury, and would not assist the jury in understanding the evidence or determining the facts in the case.

Am Jur 2d, Expert Opinion Evidence §§ 369-371.

Admissibility, at criminal prosecution, of expert testimony on reliability of eyewitness testimony. 46 ALR4th 1047.

Judge ORR concurring in part and dissenting in part.

STATE v. SUDDRETH

[105 N.C. App. 122 (1992)]

APPEAL by defendant from Judgment entered 6 June 1990 by *Judge Samuel A. Wilson, III,* in MECKLENBURG County Superior Court. Heard in the Court of Appeals 29 August 1991.

*Attorney General Lacy H. Thornburg, by Assistant Attorney General Sylvia Thibaut, for the State.*

*Cheshire, Parker, Hughes & Manning, by Joseph Blount Cheshire, V, and Richard Noel Gusler, for defendant appellant.*

COZORT, Judge.

Defendant Keith Norman Suddreth was found guilty of first-degree rape, second-degree burglary, assault with a deadly weapon inflicting serious injury, first-degree sexual offense, and first-degree kidnapping. He was sentenced to two life prison sentences and a 14-year sentence, all to run consecutively. On appeal, defendant raises several issues which question rulings made during trial. We conclude defendant received a fair trial free from prejudicial error.

The State's evidence at trial tended to show that on 16 July 1989, the victim arrived home from working the second shift at Presbyterian Hospital in Charlotte, North Carolina. As she was walking down the hall in her darkened apartment, someone jumped her from behind and threw her to the floor. The victim felt her assailant touch the back of her head with an object she thought was a gun. The attacker beat her, handcuffed her, and led her into the bedroom where he tied her to the bedposts. He then raped her. While raping her, the defendant called the victim "Baby." At one point, the victim got a "good look" at the attacker when the light was switched on momentarily. He was dressed entirely in black and was wearing an executioner's hood which had slits cut for the eyes and mouth. The victim could see the assailant's eyes and could tell they were blue. After terrorizing the victim for approximately two hours, the assailant left. The next morning the victim's neighbor discovered her after hearing pounding on the wall.

Officer Kenneth Grier of the Mecklenburg County Police Department testified that when he arrived at the crime scene, he asked the victim if she knew her attacker. The victim initially responded, "no," and then later stated, "I think I know who he is," but gave no name. At the hospital, the victim told the treating physician she was unsure about the race of the assailant. On the morning

of 17 July 1989, the victim talked with Ruth Story, a Mecklenburg County Police Investigator. The victim told Ms. Story it was the defendant who had raped and assaulted her.

The victim testified she knew the defendant because he also worked at Presbyterian Hospital. The victim and defendant established a friendly relationship during which they had had lunch, gone to a movie, attended a flower show and drank coffee at her house. She said the defendant's nickname for her was "Baby." She told the court the defendant wanted to establish a more serious relationship, but she was interested only in being friends. The defendant acted upset after the victim related her intent to maintain only a platonic relationship with him. One night in March, 1989, she discovered him peering in her window. She allowed him to come in the house to use her typewriter. He told her he wanted to have sex with her; she told him to leave. A month later, defendant again appeared uninvited at the victim's home. She talked briefly to him through the door, and he left. Later that night defendant telephoned her, and the victim told him she did not want to see him again.

The victim testified she recognized her attacker's voice as that of the defendant. On direct examination, she recalled some of the words which were exchanged before he pushed her into the bedroom.

A. I said, "Keith, I'm sorry for what I did." He said, "Now, I will have to kill you." He said, "Why didn't you want me?"

* * *

A. [The assailant said,] "I wasn't good enough for you, right?" I shook my head no, saying no. He hit me. "I wasn't good enough for you right? Agree with me."

In addition, the victim told paramedics she did not want to be taken to Presbyterian Hospital because she was afraid. She did not give the paramedics the defendant's name because she did not want other employees of the hospital talking about her.

The victim did not positively identify the defendant as being her attacker until the day before trial. She testified she was confused because she was sure defendant was her assailant, except for the color of his eyes. Her attacker's eyes were blue, while the defendant's eyes were brown. She said, "the eyes bothered

me." Testimony by the defendant's stepmother and other evidence offered by the State revealed the defendant had previously worn blue contact lenses. The victim made an in-court identification of the defendant.

The defendant's evidence included alibi testimony by six witnesses, all relatives of defendant, who testified the defendant was with them in Lenoir, North Carolina, until approximately 11:00 p.m. on 16 July 1991.

[1] Defendant first contends the trial court committed reversible error in allowing an in-court demonstration requiring the defendant to model a mask in the presence of the jury, in admitting the mask into evidence, and in reciting an improper limiting instruction. We find no reversible error. During the trial, the court ordered the defendant to don a black executioner's mask while standing before the jury. The mask was similar to the one worn by the attacker and had been purchased by the State. The demonstration was performed to help the jury verify the victim's perception of her attacker and her identification of the defendant. Defendant contends this demonstration was unfairly prejudicial. We disagree.

It is well settled that an in-court demonstration requiring a defendant to don apparel is not a Fifth Amendment violation. *See Holt v. United States*, 218 U.S. 245, 252-53, 54 L.Ed. 1021, 1030 (1910); *Schmerber v. California*, 384 U.S. 757, 763-64, 16 L.Ed.2d 908, 915-16 (1966). The main issue is whether the procedure is too prejudicial to the defendant to be permitted. The leading case dealing with this issue in North Carolina is *State v. Perry*, 291 N.C. 284, 230 S.E.2d 141 (1976). In *Perry*, the trial court ordered the defendant to put on an orange stocking mask found at the scene of the crime and to stand in front of the jury. The orange stocking mask had runs in it which allowed the victim to see part of the robber's face. In court, the victim identified the defendant as being the robber. The Court held this demonstration was not prejudicial to the defendant since it aided the jury in verifying the victim's identification. The Court stated:

> The whole purpose of the experiment was not to identify the defendant as the perpetrator of the crimes charged, but to enable the jury to determine the correctness of his contention that the wearing of this mask by the perpetrator of the of-

fenses made it impossible for [the victim] to see his features clearly enough to enable her to identify him thereafter.

*Perry*, 291 N.C. at 291-92, 230 S.E.2d at 145.

In support of its holding, the *Perry* case cited *United States v. Roberts*, 481 F.2d 892 (5th Cir. 1973), in which the defendant was instructed to model the mask used by the robber to allow the witness the opportunity to compare the similarity of the defendant's appearance while wearing the mask to the robber's appearance. The court stated, "[t]he Supreme Court has long held that the Fifth Amendment privilege against self-incrimination offers no protection against the compulsion to don an item of apparel worn by the person committing the offense in order to facilitate identification." *Roberts*, 481 F.2d at 894.

As in *Perry*, we find no unfair prejudice because the demonstration was conducted to aid the jury in determining whether or not the victim could see the color of the defendant's eyes. Furthermore, the fact that the mask was not the exact mask worn by the perpetrator does not preclude its use. The Court in *Perry* cited *United States v. Turner*, 472 F.2d 958 (4th Cir. 1973), in which the trial court required the defendant to wear a wig and sunglasses "similar" to ones worn by the robber in order to aid in identifying the perpetrator. We find the demonstration in the case below and the mask's admission into evidence to be no prejudicial error.

[2] Defendant additionally questions the correctness of the limiting instruction given prior to the demonstration. Rather than instructing the jury as defendant requested, the trial court instructed the jury as follows:

Ladies and gentlemen, a demonstration is going to take place in just a moment, and I want to instruct you at this time that you should not place undue emphasis on this testimonial identification. This demonstration is for illustrative purposes only. The hood that is going to be placed on the Defendant's head is not the hood that was worn by the alleged assailant on the night of the alleged assault. It is for you, and you only, to determine what weight, if any, must be given to this demonstration.

Defendant argues the words "testimonial identification" contradict the statement "for illustrative purposes only." Despite the char-

acterization of the demonstration as a "testimonial identification," the instruction specifically indicated the hood was not the one used by the attacker, was for illustrative purposes only, and undue emphasis should not be placed on the demonstration. This instruction served to guard against any misunderstanding by the jury. Even assuming the instruction was error, defendant has failed to demonstrate how a different result would have been achieved at trial. N.C. Gen. Stat. § 15A-1443(a) (1983). We therefore cannot say such an error was prejudicial.

[3] Defendant next argues the trial court committed prejudicial error by admitting into evidence an arrest report and photo for identification purposes. In the case below, the State introduced a picture of defendant attached to a prior arrest report for an unrelated trespassing misdemeanor as evidence of the assailant's identity. The State's purpose in displaying the photo and report was to show the defendant had worn blue contact lenses in the past, and therefore could have worn the colored lenses on the night of the attack. Again, we find no prejudicial error.

All relevant evidence is generally admissible. N.C. Gen. Stat. § 8C-1, Rule 402 (1988). Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C. Gen. Stat. § 8C-1, Rule 401 (1988). Rule 404(b) states:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident.

The probative value of such evidence must substantially outweigh any danger of unfair prejudice. N.C. Gen. Stat. § 8C-1, Rule 403 (1988). North Carolina courts have been liberal in allowing evidence to be admitted pursuant to Rule 404(b). *State v. Cotton*, 318 N.C. 663-66, 351 S.E.2d 277, 279 (1987). Rule 404(b) is a "general rule of *inclusion* of relevant evidence of other crimes, wrongs or acts by a defendant . . . ." *State v. Coffey*, 326 N.C. 268, 278-79, 389 S.E.2d 48, 54 (1990) (emphasis in original). In a criminal case, the identity of the perpetrator of the crime is always a material fact. *State v. Johnson*, 317 N.C. 417, 425, 347 S.E.2d 7, 12 (1986).

Therefore, " '[w]here . . . such evidence reasonably tends to prove a material fact in issue in the crime charged, it will not be rejected merely because it incidentally proves the defendant guilty of another crime,' but only if the sole logical relevancy of that evidence is to suggest defendant's predisposition to commit the type of offense with which he is presently charged." *State v. Jeter*, 326 N.C. 457, 458, 389 S.E.2d 805, 807 (1990) (quoting *State v. Johnson*, 317 N.C. at 425, 347 S.E.2d at 12).

In *State v. Carson*, 80 N.C. App. 620, 343 S.E.2d 275 (1986), this Court held testimony regarding defendant's arrest on an unrelated charge admissible "for the limited purpose of explaining [the witness's] initial identification of the defendant." *Id.* at 625, 343 S.E.2d at 278. The witness had observed the defendant and then recognized him on a television news broadcast regarding an arrest on an unrelated charge. The admission of the evidence was not "so prejudicial as to require a new trial." *Id.* Similarly, in the case below, the evidence was relevant in order to prove the perpetrator's identity. The victim testified she thought defendant was her attacker except for the eyes. The photo and arrest report indicated defendant's having had blue eyes at one time. This identification issue made the evidence of vital importance. Furthermore, this evidence was not overly prejudicial. The probative value of the evidence in this case was something other than to show merely the defendant had the propensity or disposition to commit an offense of the nature of the crime charged. Since under the circumstances the probative value of the evidence outweighed any prejudice to the defendant, the trial court properly admitted the picture and report.

[4] Additionally, the trial court gave the jury a limiting instruction which established the evidence as being considered for identification purposes only and notified the jury that the misdemeanor charge had in fact been dismissed. The instructions provided:

> Ladies and gentlemen, this evidence that's just received, it's received only, and is to be considered by you, only for such bearings as it may have, if any, on the identity of the Defendant. This was an arrest for a minor misdemeanor, the charges of which were later dismissed. This evidence is not to be considered by you as any evidence of criminal character.

This instruction adequately removed any potential prejudicial effect the evidence may have had.

STATE v. SUDDRETH

[105 N.C. App. 122 (1992)]

Defendant next argues the trial court erred in admitting into evidence a photograph of certain items found during a search of defendant's car and residence. When police officers searched defendant's automobile as part of their investigation, they found two sheath knives, a slapjack and a police baton. The weapons were checked for blood using a luminaire light; no traces of blood were found. At trial, the State introduced into evidence a picture of the weapons. Defendant argues the photograph was irrelevant, and even if relevant, the picture was unfairly prejudicial. We disagree.

Photographs are usually competent to explain or illustrate anything that is competent for a witness to describe in words. *State v. Holden*, 321 N.C. 125, 140, 362 S.E.2d 513, 524 (1987), *cert. denied, Holden v. California*, 486 U.S. 1061, 100 L.Ed.2d 935 (1988). In her direct examination, the victim testified her attacker thrust something which felt like a gun against her head, cut off her clothes with a knife, traced her body with a long thin knife, and beat her with something which felt like a club. The photograph of the items found in defendant's vehicle was relevant to show the possibility of weapons which were used or could have been used in the attack. The probative value of the photograph additionally outweighed any prejudice if such prejudice can be said to have existed.

[5] Defendant next argues the trial court erred in admitting into evidence the testimony of a hair analysis expert. Defendant disputes the expert's use of statistical analysis in explaining his comparison of a hair sample taken from a paper towel at the crime scene with a hair sample from the defendant. A criminalist from the Charlotte Mecklenburg Crime Lab, Elinus Whitlock, III, testified the unknown hair from the paper towel was consistent with the hair sample from defendant. Mr. Whitlock gave the following testimony on direct examination:

In this case, I found that the unknown hair from the paper towel is consistent with the hair standard from Keith Suddreth.

Q. What do you mean by "consistent with"?

A. I mean he exhibited all the same macroscopic and microscopic characteristics, and it is quite likely to have originated from Keith Suddreth.

* * *

Q. How likely is it to have originated from Keith Suddreth?

A. . . . .

Based on my experiences with hairs that I have examined, the characteristics I have seen in this hair it is certainly better than one out of a hundred, and my estimation is close to one out of a thousand. Meaning, if you pick an individual at random off the street, there is only one out of a thousand chance that the unknown hair would match or would also be consistent with that person's hair.

Defendant contends the hair expert's testimony, "it is quite likely to have originated from Keith Suddreth," coupled with the statistical probability opinion, constituted a positive identification of defendant as the attacker. Defendant contends the testimony was error, citing our decision in *State v. Faircloth,* 99 N.C. App. 685, 394 S.E.2d 198 (1990). We find *Faircloth* distinguishable from the case below and hold the trial court committed no error.

Our courts have liberally permitted the introduction of expert testimony as to hair analysis when relevant to aid in establishing the identity of the perpetrator. *See, e.g., State v. McNicholas,* 322 N.C. 548, 369 S.E.2d 569 (1988); *State v. Hannah,* 312 N.C. 286, 322 S.E.2d 148 (1984). While hair analysis evidence is admissible in criminal cases under a broad scope of relevancy, "[u]nlike fingerprint evidence, however, comparative microscopy of hair is not accepted as reliable for positively identifying individuals. Rather, it serves to exclude classes of individuals from consideration and is conclusive, if at all, only to negative identity." *State v. Stallings,* 77 N.C. App. 189, 191, 334 S.E.2d 485, 486 (1985) (citations omitted), *disc. review denied,* 315 N.C. 596, 341 S.E.2d 36 (1986).

In *Faircloth* the expert testified that " 'it would be improbable that these hairs would have originated from another individual' " and further stated that it would have been "impossible" for someone other than the defendant to have been in contact with the crime area and the victim's person. *Faircloth,* 99 N.C. App. at 692, 394 S.E.2d at 202. The Court found the statements to be "effectively, a positive identification of defendant derived from the hair evidence." *Id.* We do not find, however, that the testimony in the present case rises to the level of becoming a positive identification of the defendant. The expert's statement, "it is quite likely to have been from Keith Suddreth," does not rule out the

STATE v. SUDDRETH

[105 N.C. App. 122 (1992)]

possibility the hair originated from a source other than the defendant. The statistical illustration also did not eliminate the possibility of other sources and was based on the expert's experience and expertise in the hair microscopy field. Furthermore, the witness refuted a suggestion by defense counsel that the expert was equating the characteristics of head hair to the uniqueness of fingerprints:

Q. Well, you are not saying that the characteristics of head hair are so unique that they are like a fingerprint, are you?

A. Oh, no. I cannot say that this hair came from a subject to the exclusion of all other individuals . . .

Q. Right. Right.

A. . . . because it is possible that the hair came from another individual.

Finally, the trial court instructed the jury, "comparative microscopy of hair is not accepted as reliable for positively identifying individuals and is not conclusive." We are of the opinion that the expert did not venture beyond his area of expertise, the testimony did not constitute a positive identification, and the trial court's instructions prevented the jury from reaching a decision based solely on the hair analysis testimony. We conclude the trial court committed no error.

[6] Next, defendant challenges the trial court's decision to exclude the testimony of an expert witness concerning the factors affecting the reliability of eyewitness identification. Defendant called Dr. Gary Long, a social psychology professor from the University of North Carolina, to testify in the area of eyewitness identification. The trial court refused to allow the witness's testimony, finding the evidence was not case specific, did not have sufficient probative value, would confuse the jury and would not assist the jury in understanding the evidence or determining the facts in the case. We agree.

"This court has held that the admission of expert testimony regarding memory factors is within the trial court's discretion, and the appellate court will not intervene where the trial court properly appraises probative and prejudicial value of the evidence under Rule 403 of the Rules of Evidence." *State v. Cotton*, 99 N.C. App. 615, 621, 394 S.E.2d 456, 459 (citing *State v. Knox*,

STATE v. SUDDRETH

[105 N.C. App. 122 (1992)]

78 N.C. App. 493, 495-96, 337 S.E.2d 154, 156 (1985) ). The standard for admitting such testimony was spelled out in *Knox*:

> Expert testimony is properly admissible when it "can assist the jury to draw certain inferences from facts because the expert is better qualified." The test for admissibility is whether the jury can receive "appreciable help" from the expert witness. Applying this test requires balancing the probative value of the testimony against its potential for prejudice, confusion, or undue delay. *See* N.C. Gen. Stat. 8C-1, Rule 403. Even relevant evidence may be excluded if its probative value is outweighed by the danger that it will confuse or mislead the jury. The court "is afforded wide latitude of discretion when making a determination about the admissibility of expert testimony."

*Knox*, 78 N.C. App. at 495, 337 S.E.2d at 156 (citations omitted). In the *Knox* case, as in the case below, Dr. Long was the proffered expert witness. The Court refused to permit Dr. Long to testify because his testimony was not case specific; "he testified generally about memory variables affecting the accuracy of eyewitness identification." *Id.* With respect to the present case, although the evidence held some probative value, the trial court did not find the evidence to be indispensable. Dr. Long did not interview the victim, did not visit the scene of the crime, and did not observe the victim testify. The only basis for Dr. Long's testimony was his review of the transcript of the victim's testimony. We find it proper to defer to the trial court's discretion. We conclude the court committed no error.

Next, defendant disputes the trial court's denial of his motion to dismiss for insufficiency of the evidence. The standard for ruling on a motion to dismiss is "whether there is substantial evidence (1) of each essential element of the offense charged and (2) that defendant is the perpetrator of the offense." *State v. Lynch*, 327 N.C. 210, 215, 393 S.E.2d 811, 814 (1990). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Smith*, 300 N.C. 71, 78-79, 265 S.E.2d 164, 169 (1980). The test for sufficiency of the evidence is the same regardless of whether the evidence is circumstantial or direct. *State v. Earnhardt*, 307 N.C. 62, 68, 296 S.E.2d 649, 653 (1982). We find the evidence in the case below was sufficient for a jury to reasonably infer the defendant's guilt

**STATE v. SUDDRETH**

[105 N.C. App. 122 (1992)]

from the circumstances shown. We conclude the trial court did not err in denying defendant's motion to dismiss the charges.

Defendant's remaining assignments of error deal with jury instructions. A review of the jury instructions given by the trial judge discloses no prejudicial error.

No error.

Judge LEWIS concurs.

Judge ORR concurs in part and dissents in part.

Judge ORR concurring in part and dissenting in part.

With the exception of the issue pertaining to the testimony of the hair analysis expert, I concur in the majority opinion. With respect to the issue pertaining to the hair analysis expert's testimony, I respectfully dissent. In my view, *State v. Faircloth*, 99 N.C. App. 685, 394 S.E.2d 198 (1990), is not distinguishable from the case *sub judice*.

This Court in *Faircloth* found that the expert's testimony that "it would be improbable that these hairs would have originated from another individual" was "effectively, a positive identification of defendant." *Id.* at 692, 394 S.E.2d at 202. The expert testified below that "it is quite likely to have originated from Keith Suddreth," and in response to a question as to how likely it is to have originated from Keith Suddreth, he stated that it is "certainly better than one out of a hundred, and my estimation is close to one out of a thousand." I would hold that here, as in *Faircloth*, the expert's testimony was an impermissible positive identification of defendant. The hair comparison analysis was an important link in establishing the identity of defendant as the perpetrator where there was only the victim's opinion that the masked assailant was the defendant and there were alibi witnesses for the defendant. I would therefore hold that this testimony is inadmissible and that defendant is entitled to a new trial.